UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| GEORGE METZ, MARILYN METZ, AUBREY PEARSON, JR., JACQUELINE PEARSON, BERRY WRIGHT, and EVELYN WRIGHT,<br><br>    Plaintiffs,<br><br>v.<br><br>WILLIAM B. HERBERT, IV (in his official capacity as Zoning Administrator); METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, acting by and through its Planning Commission and Board of Zoning Appeals; and THE RIDGE AT ANTIOCH, LIMITED PARTNERSHIP,<br><br>    Defendants. | Case No. 3:16-cv-2935<br>Judge Aleta A. Trauger |

## MEMORANDUM

Pending before the court are two Motions to Dismiss, one filed by the defendant, The Ridge at Antioch, Limited Partnership (the "Ridge") (Docket No. 14), and one filed by the remaining defendants, the Metropolitan Government of Nashville and Davidson County and William B. Herbert, IV, in his official capacity as Zoning Administrator (collectively, "Metro") (Docket No. 17), to which the plaintiffs have filed a single Response in opposition (Docket No. 18). For the reasons discussed herein, the defendants' motions will be granted.

## BACKGROUND & PROCEDURAL HISTORY

This housing discrimination action was filed on November 18, 2016. (Docket No. 1.) The plaintiffs, who are a mix of African American and Caucasian individuals, are all homeowners and neighbors of a development area in Davidson County called the Forest View Park Planning Unit Development District (the "PUD"). The Ridge is a private developer that is

1

planning to build within the PUD, subject to Metro's approval, affordable multi-family housing that renders the Ridge eligible for federal Low Income Housing Tax Credits ("LIHTCs") through the State of Tennessee. The gravamen of the Complaint appears to be the plaintiffs' allegations that they have already suffered, and will continue to suffer, economic injury in the form of decreasing property values as a result of this adjacent development. The basis for this legal action is the plaintiffs' allegations that the defendants have unfairly targeted their neighborhood as a location for the development of LIHTC-eligible housing because the neighborhood currently has a higher percentage of racial minority residents than other areas of Davidson County. The Complaint alleges that building LIHTC-eligible housing, which itself attracts a disproportionate number of minority residents, in their neighborhood will advance racial segregation within the county and will perpetuate a concentration of poverty in predominantly minority communities such as the plaintiffs' neighborhood. According to the Complaint, predominantly Caucasian neighborhoods in the county tend to be zoned to exclude multi-family housing and tend to be treated differently with respect to the approval process for developers to build low-income housing there. The Complaint does not, however, point to any specific neighborhoods that have been treated differently than theirs with respect to zoning decisions or low-income housing development.

The allegations in the Complaint center on two types of alleged misconduct by Metro: 1) approving the Ridge's development plans, despite environmental concerns regarding the level of toxins in the soil on the PUD site and the susceptibility of the topography of the site to sinkholes, and 2) approving ongoing changes to the Ridge's development plans (including the shifting of conditionally approved residential units from one part of the development site to another), without subjecting those changes to review by the Metropolitan Council. The Complaint

specifically alleges that these actions violate Metro's own official policies and that Metro has committed these violations in a discriminatory manner due to the racial composition of the plaintiffs' neighborhood. The Complaint further alleges that the Ridge was aware of these discriminatory practices by Metro and has taken advantage of them for its own economic benefit. According to the Complaint, the Ridge's evolving development plans would not have been approved by Metro under the same conditions had the development project taken place in a predominantly Caucasian area of the county. Again, the Complaint, however, does not make any specific factual allegations about development projects in other areas of the county that have been treated differently by Metro.

With respect to the environmental concerns, the Complaint makes the general allegation that levels of certain toxins have been found in the PUD site soil that could cause health concerns both for neighbors of the site during the development and, later, for residents. The Complaint also alleges that the propensity for sinkholes could pose both economic and safety concerns for the site itself and for adjacent properties. The Complaint does not, however, raise any specific factual allegations as to whether or how these environmental concerns are being addressed by Metro and/or the Ridge, nor do they cite any environmental regulations that allegedly have been, or stand to be, violated. Moreover, the Complaint does not make any specific factual allegations about the presence of environmental contaminants or risks having ever been handled differently in any other areas of the county (though there is the vague conclusory and hypothetical allegation that, in a predominantly Caucasian community, these concerns would be treated differently).

With respect to the lack of review by the Metropolitan Council of ongoing changes to the Ridge's development plans, the plaintiffs point to the official written policies of Metro's Planning Commission for how to respond to requested changes to development plans after an

3

initial conditional approval has been granted by the Council. According to the Complaint, these official policies permit certain types of minor changes to be treated as "revisions" that can be approved by the Commission alone but require other types of changes, such as those that would change the access to public streets, to be reviewed again by the Council as "amendments" to the development plan before approval is given.[1] The Complaint alleges that the Planning Commission has treated certain changes that the Ridge has requested to make to its conditionally approved development plan for the PUD as revisions, when they should have been treated as amendments. According to the Complaint, this demonstrates an unwritten internal Metro policy and practice of violating the official guidelines when approving the development of low-income housing in neighborhoods that are predominantly comprised of racial minorities. Again, however, the Complaint contains no allegations about other areas in the county where the Planning Commission has interpreted the official guidelines differently than it did here, or treated similar requests for changes to conditionally approved development plans differently.

The Complaint purports to bring claims for violations of the following laws, without specifying which claims are brought against which defendants: the Civil Rights Act, 42 U.S.C. §§ 1981 ("Section 1981"), 1982 ("Section 1982"), and 2000d *et seq*. ("Title VI"); the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*. (the "FHA") (in particular, the Complaint names FHA sections 3604(a), 3604(f), and 3617); the due process and equal protection clauses of the

---

[1] It is not entirely clear from the record which types of changes warrant Council review and which do not, as per Metro's official written policies, but the plaintiffs allege that at least some of the changes made by the Ridge should have been reviewed by the Council but were, instead, approved by the Planning Commission without Council review.

4

United States and Tennessee Constitutions;² the Tennessee Human Rights Act (the "THRA"); Title 17 of Metro's Zoning Code; the "Nashville Next Plan;" Section 2.222.020(k) of Metro's Code of Ordinances; Mayor Barry's Executive Order 005; and the "pending legislation doctrine" cited in *Harding Academy v. Metropolitan Government of Nashville and Davidson County*, 222 S.W.3d 359, 364 (Tenn. 2007). The Complaint seeks compensatory and punitive damages, as well as attorney's fees and costs. It also seeks a range of injunctive relief, including an injunction to stop the Ridge's development of the PUD and/or prohibit its ability to receive LIHTC benefits for the development.

On January 20, 2017, the Ridge filed its Motion to Dismiss (Docket No. 14), along with a Memorandum in support (Docket No. 15). On the same day, Metro also filed a Motion to Dismiss (Docket No. 16), along with a Memorandum in support (Docket No. 17). On February 3, 2017, the plaintiffs filed a Response to both motions. (Docket No. 18.) In their response, the plaintiffs appear to concede that they are only bringing the following four claims: 1) violation of Section 1982, 2) violation of the FHA, 3) violation of the THRA, and 4) violation of the due process and equal protection clauses of the United States and Tennessee constitutions. The plaintiffs do not argue that the other local level statutes and regulations cited in the Complaint are distinct causes of action that they wish to pursue.³ The plaintiffs also do not defend their

---

² The Complaint does not specifically reference 42 U.S.C. § 1983, though, as discussed below, this is clearly the avenue under which a claim for violating the due process or equal protection clauses of the United States Constitution can be brought against Metro as a municipality.

³ Indeed, this is consistent with the court's finding herein that none of the local level regulations named in the Complaint appear to give rise to a private right of action. Nor does the "pending legislation doctrine," identified by the Tennessee Supreme Court in *Harding Academy v. Metropolitan Government of Nashville and Davidson County*, give rise to a private right of action in this context. 222 S.W.3d 559 (Tenn. 2007). To the contrary, the doctrine provides a defense to government defendants who have denied an otherwise appropriate request for a permit or zoning change, where pending legislation would be undermined by granting the request. *Id*.

claims brought under Section 1981 or Title VI of the Civil Rights Act.[4] Finally, the plaintiffs still do not clarify in their briefing which claims are being brought against which defendants.

## LEGAL STANDARD FOR MOTION TO DISMISS

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79

---

[4] In fact, the court notes that Section 1981 protects the right to make and enforce contracts, and there are no allegations here that the plaintiffs have suffered any contractually based injury. Likewise, Title VI protects access to programs receiving federal funding. While the allegations in the Complaint suggest that the development at issue in this action may have received federal funding in the form of LIHTCs for the Ridge, there are no allegations to suggest that the plaintiffs were themselves denied access to such tax credits or were denied access to the LIHTC-eligible housing in development by the Ridge that was the subject of the federal funding.

6

(2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

## ANALYSIS

This is a unique case in that the claims at issue are for racial discrimination in the context of housing and municipal zoning, yet the claims are not based on allegations that the plaintiffs themselves have been denied access to housing or that their properties have been directly subject to the zoning decisions being challenged.[5] The defendants point out in their briefing that the plaintiffs are a racially diverse group alleging that they have all suffered the same injuries, and the defendants argue that, therefore, the defendants' conduct cannot be said to have had a disparate impact on any particular racial group. The plaintiffs emphasize, however, that, rather than claiming a disparate impact on any individual plaintiff, they are bringing claims on behalf of their entire neighborhood, which is disproportionately comprised of racial minorities, and their claims are about the disparate impact of the defendants' actions on their neighborhood as a whole, relative to other predominantly Caucasian neighborhoods. The court finds that the primary flaw in the plaintiffs' argument is not the fact that the plaintiffs are not all racial minorities but, rather, the plaintiffs' failure to show that the particular rights that are relevant to the claims at issue have been violated at all, let alone that these rights have been violated on the basis of race.

As best the court can discern, the plaintiffs are seeking redress for what is essentially an economic interest in the value of their properties that they allege has been injured by the decision to allow low-income housing to be developed nearby. As discussed more fully below,

---

[5] To the extent that the plaintiffs claim that they have been or will be directly injured by the environmental impact of the development, as noted above, they have not alleged any specific environmental regulations that have been violated.

7

any such interests are not protected by Section 1982, the FHA, or the substantive due process protections of the 14th Amendment to the United States Constitution. The procedural due process claim has not been adequately pled because the Complaint does not allege sufficient facts to find that the plaintiffs have been denied the opportunity to be heard in connection with the loss of a protected property right. The equal protection claim against Metro is the most fitting claim in this action, to the extent that the plaintiffs are alleging that their economic interests have been treated differently by Metro than the economic interests of homeowners in predominantly Caucasian neighborhoods within Davidson County. As discussed more fully below, however, this claim, too, has not been sufficiently pled because the record is devoid of any factual allegations that similarly situated neighborhoods have, in fact, been treated differently by Metro with respect to any of the alleged misconduct, let alone that any such differential treatment can be attributed to race.

I. **Section 1982 Claims**

Section 1982 provides as follows: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." The Sixth Circuit has explained that Section 1982 protects individual interests in access to real property and prohibits the denial of such access based on discrimination motivated by race. *Moniz v. Cox*, No. 11-1790, 512 F. App'x 496 (6th Cir. Jan. 22, 2013). While the Sixth Circuit has acknowledged that this right includes the right for non-owners, such as renters and visitors, to access property (*see U.S. v. Brown*, 49 F.3d 1162 (6th Cir. 1995)), there is no authority to suggest that Section 1982 protects the interests that the plaintiffs are alleging were injured here, which are the economic interests in the value of their property as impacted by neighboring development. The plaintiffs have cited no

8

authority for extending Section 1982 to cover this sort of interest, nor is the court aware of any. For this reason, the court finds that the plaintiffs have not sufficiently alleged a claim under Section 1982.

As discussed above, the problem is not that the plaintiffs are a racially mixed group. Rather, the problem is that the plaintiffs are not alleging that they have been denied the right to access real property. The plaintiffs cite the Sixth Circuit case *Winston v. Lear-Siegler, Inc*. for the proposition that white plaintiffs may sue under Section 1982, as *Winston* discusses a Supreme Court case in which a white homeowner successfully sued the residential community to which he belonged for prohibiting him from assigning his interests to a black tenant.[6] 558 F.2d 1266 (6th Cir. 1977) (citing *Sullivan v. Little Hunting Park*, 396 U.S. 229 (1969)). *Sullivan* does not provide grounds to support the plaintiffs' action, however, because it is about a wholly different right that was being infringed. The *Sullivan* case, as discussed in *Winston*, was not primarily about an economic injury to the white plaintiff but, rather, it was about the impact on the black tenant's access to housing and the court's finding that the white property owner had standing to bring the claim because he had been injured by his attempt to vindicate the rights of his tenant. *Winston*, 558 F.2d at 1269. Here, the plaintiffs are simply not alleging that the right to own or access a residence under Section 1982 was violated.[7]

---

[6] *Winston* itself involves the right of a white employee to sue an employer under Section 1981 based on retaliation for defending the rights of a black co-worker. The plaintiffs cite *Winston*, however, for its discussion of *Sullivan*.

[7] Read generously, the Complaint could be said to allege that the plaintiffs' access to their properties has been infringed due to the environmental concerns raised. The plaintiffs do not, however, allege that they have been unable to use their properties in the intended way; nor, again, do they cite any particular environmental regulations that have been violated. Moreover, it would be quite a stretch to interpret Section 1982 to protect a homeowner's right to be free of any environmental concerns that have been caused or unaddressed due to the homeowner's race, and the plaintiffs have provided no authority for doing so.

The plaintiffs also cite *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), for the proposition that Section 1982 should be read broadly. *Jones*, however, is an action that arises from a developer refusing to sell a home to an African American plaintiff, and the Supreme Court interpreted Section 1982 to give rise to liability on the part of private developers in this situation, rather than limiting Section 1982 liability to municipalities. Again, however, the same right was being vindicated as in the other Section 1982 cases – the right to access real property. The broadening of the statute simply related to which parties could be held liable for upholding this right. The instant case, to the contrary, again simply does not involve any claim that the plaintiffs were denied access to housing and seeks to broaden Section 1982 well beyond the bounds of rights protected by the statutory text.

Finally, it is important for the court to note that one of the primary goals of Section 1982 is clearly to ensure that racial minorities have the opportunity to live in safe, affordable housing in any area in which they desire to live. Federal support for municipalities that allow the development of low-income housing and for developers that build it (such as the LIHTC program at issue in this action) appears to be designed to advance the opportunities for fair access to safe housing for all people, regardless of income, a measure that the Complaint itself acknowledges will be of a disproportionate benefit to people of racial minorities. It would then be a perversion of Section 1982 for neighbors of low-income housing developments to invoke the statute in order to deny access to low-income housing in their neighborhoods because of the impact such development might have on the value of their adjacent properties.

For these reasons, the court finds that the plaintiffs' have not adequately pled a Section 1982 claim, and this claim must be dismissed.

## II. FHA Claims

Similarly, the rights protected by the FHA do not apply to this action for the same reasons. Like Section 1982, the FHA also protects access to housing. The plaintiffs cite three particular sections of the FHA that allegedly have been violated by the defendants: sections 3604(a), 3604(f), and 3617. Section 3604(a) renders it unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Section 3604(f) additionally prohibits discrimination in access to housing on the basis of disability. Section 3617 renders it unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by sections 3603, 3604, 3605, or 3606 of this title." The remaining provisions of the FHA regulate conduct by sellers and lessors of real property and by their agents and brokers that would inhibit access to residential property on the basis of race or other protected categories. There are no provisions of the FHA that address economic interests in the value of one's real property, which is the right the plaintiffs seek to vindicate in this action.

As the plaintiffs correctly point out, the Supreme Court has held that the FHA can support a disparate impact claim for "unlawful practices including zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification." *Texas Dep't of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507 (2015). Again, however, the claim at issue in this action is not about anyone being *excluded* from a neighborhood, and it is certainly not about the plaintiffs having been excluded. To the contrary, this action arises from allegations that access to homes in the

11

plaintiffs' neighborhood is being *granted* to prospective low-income residents through the development of affordable housing. The only way an FHA action might arise in the context of the placement of low-income housing in the plaintiffs' neighborhood is if there were allegations that such housing is, in fact, being excluded from other areas in Davidson County on the basis of the race (or other protected status) of the prospective residents. Even then, this would not give rise to a right of action by the plaintiffs, who are not themselves the prospective residents of the low-income housing being built.

In any event, as discussed above, there are no such allegations here, aside from the vague and conclusory assertion that the plaintiffs' neighborhood is being treated differently than other unnamed areas in Davidson County that are comprised of predominantly Caucasian residents. Moreover, *Texas* explains that disparate impact liability under the FHA does not simply attach any time there is an alleged statistical disparity between communities where low-income housing is permitted to develop and communities where it is not, unless it can be shown that the motivating factor in determining the placement of the low-income housing was race rather than other valid considerations. 135 S.Ct. at 2522-23. "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make out a *prima facie* case of disparate impact." *Id*. at 2523. Again, the plaintiffs have not put forth any such allegations.

The plaintiffs cite *Trafficante v. Metropolitan Life Ins., Co.*, 409 U.S. 205 (1972), for the proposition that the FHA should be read broadly to support claims by plaintiffs who are not a part of an FHA-protected class. *Trafficante*, however, involved claims that were about the exclusion of prospective non-white residents from a housing complex based on their race, even though the action itself was brought by white residents of the complex who claimed they were

injured by the denial of a racially integrated community.[8] The claims in the instant action are simply not about any such race-based exclusion, regardless of the race of the plaintiffs. The plaintiffs also cite *Huntington v. Huntington*, 488 U.S. 15, 16 (1988), as an example of a case where a zoning ordinance involving subsidized housing was held to have a racially disparate impact, because a disproportionate number of racial minorities benefitted from subsidized housing. *Huntington*, however, again, involved claims that prospective residents were being denied access to a certain community based on their race when the defendants refused to allow a developer to place the subsidized housing in a predominantly white community. Again, the instant action does not allege this type of exclusion but, instead, challenges the inclusion of low-income housing in the plaintiffs' neighborhood on the theory that it has been done because of the racial composition of the plaintiffs' neighborhood. As discussed above, without any allegations of low-income housing being excluded elsewhere, there is simply no factual basis in the Complaint for an FHA claim to survive, and there is no FHA claim that can be brought on behalf of the plaintiffs.

For these reasons, the plaintiffs have failed to sufficiently plead a claim under the FHA, and this claim must be dismissed.

### III. Federal Constitutional Claims

As an initial matter, the plaintiffs' federal constitutional claims do not apply to the Ridge and are understood to be brought only against Metro, pursuant to 42 U.S.C. § 1983, for the following reasons. Private actors are generally not liable for constitutional violations unless they acted under color of state law. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974).

---

[8] Moreover, *Trafficante* was subsequently overturned by *Thompson v. North American Stainless, LP*, 563 U.S. 170 (2011), which held that only parties whose rights under the FHA have been aggrieved may bring suit, not others who were tangentially injured by the violation.

13

The Sixth Circuit has held that, in order for a private entity to be liable for a 14th amendment violation, the entity's action must be attributable to the state on one of three grounds: 1) it is an action that is traditionally exclusively reserved to the state; 2) the action was coerced by the state to such an extent that it can be found to be a compulsory state action; or 3) there is a symbiotic relationship between the state and the private entity. *See Romanski v.Detroit Entm't*, L.L.C., 428 F.3d 629, 636 (6th Cir. 2005) (citing *Wolotsky v. Huhn*, 960 F.2d 1331 (6th Cir. 1992)). The fact that a private entity "derives a significant portion of its funding from the government does not convert it into a state actor" for 14th Amendment purposes. *Wolotsky*, 960 F.2d at 1335-36. None of the three grounds outlined above has been alleged, nor could any of these grounds be reasonably inferred with respect to the Ridge based on the allegations in the Complaint. There are no allegations in the Complaint that the Ridge, in making plans to develop low-income housing in the PUD, took actions that are generally reserved to the state or to Metro, that the Ridge was coerced by Metro, or that the Ridge was in a symbiotic relationship with Metro.[9] The fact that the Ridge allegedly received federal tax credits through the State of Tennessee for developing LIHTC-eligible housing in the PUD does not, alone, render it liable for upholding the plaintiffs' constitutional rights.

With respect to their due process claims against Metro, the plaintiffs appear to argue that both their procedural and substantive due process rights have been violated. As for their procedural due process claim, the plaintiffs argue that, because Metro acted in a manner that is inconsistent with its official policies in approving the Ridge's changing development plans without Council review, the plaintiffs had no notice that Metro would act in this manner and

---

[9] At most, the Complaint alleges that the Ridge had inside information about Metro's internal practices and used this information to its advantage in getting its development plans approved. This does not create a symbiotic relationship.

were, therefore, unable to be heard in opposition to Metro's decision-making practices. The plaintiffs, however, cite no authority for the proposition that they are entitled to be given notice of Metro's internal decision-making practices or to have the opportunity to oppose them. To the extent that the plaintiffs were entitled to be heard with respect to Metro's actual zoning decisions regarding the PUD, including its decisions to approve changes to the Ridge's development plans, there are no allegations in the Complaint to suggest that they were denied such an opportunity. Indeed, as the defendants point out, the minutes of Planning Commission meetings that are attached to the Complaint appear to suggest that there was an opportunity for the plaintiffs to be heard, in that members of the public were welcome to speak at Planning Commission meetings where the zoning decisions at issue were discussed. (*See* Docket Nos. 1-2, 1-3, 1-4, 1-6, 1-31, 1-32, 1-33, 1-35, 1-36, 1-37, 1-38.) More importantly, the plaintiffs raise no particular allegations to suggest that they were denied such an opportunity. While the plaintiffs allege that certain changes to the Ridge's development plans were treated as revisions rather than amendments and were, therefore, not subject to review by the Metropolitan Council, the plaintiffs make no allegations that this in any way affected their right to be heard with respect to the decisions themselves and how those decisions may have impacted the plaintiffs' economic interests.

Moreover, the Sixth Circuit has held that procedural due process liability only arises where there is a clear property right that triggers due process protections. *See Braun v. Ann Arbor Charter Tp.*, 519 F.3d 564, 573 (6th Cir. 2008) ("In order to have a property interest in a benefit, a person must have more than a desire for it or unilateral expectation of it; rather, he must have a legitimate claim or entitlement to it"). The only property interest asserted by the plaintiffs is in the value of their real property as it is impacted by the development of adjacent low-income housing. The Sixth Circuit held in *Braun* that a property interest for due process

15

purposes can be asserted where a plaintiff's own property is re-zoned in a way that unexpectedly changes the plaintiff's ability to use the property but that such a right cannot be asserted where a plaintiff simply desires an unpromised change in the zoning for his property, and that change is denied. In this instance, the plaintiffs are challenging the approval of final development plans for undeveloped land adjacent to their properties, where there are no allegations that these decisions affect the plaintiffs' use of their own properties. It is not entirely clear that this interest would give rise to a procedural due process right, particularly given the allegations in the Complaint that, even though there may have been changes to the development plans over time, the land has not yet been fully developed, nor have the development plans been finalized and approved. It is not, then, at all clear that a change to the conditionally approved development plans can be found to be unexpected or to constitute any true substantive change to the reasonable expectations the plaintiffs may have had about this undeveloped PUD in their neighborhood. Even though the plaintiffs have alleged an economic interest in the final development plans, they have not alleged a sufficient expectation that any particular plan (or resulting impact on their property values) would remain in place so as to give rise to a right protected by due process. Accordingly, the plaintiffs have not sufficiently alleged a procedural due process violation.

With respect to their substantive due process claims, again, the plaintiffs are not actually challenging zoning decisions that affect the use of their own properties but, rather, are challenging zoning decisions about the use of an adjacent parcel of land which might, in turn, affect their property values. The plaintiffs cite *Pearson v. City of Grand Blanc*, 961 F.2d 1211 (6th Cir. 1992), for the proposition that there may be a substantive due process violation based on arbitrary and irrational zoning changes, but *Pearson* is about a property owner's right to be

16

protected against arbitrary zoning changes that wholly inhibit the use of their property. *Pearson* does not provide support for finding a substantive due process interest in the zoning of adjacent properties. Nor do the plaintiffs cite any such authority. As discussed above, it is not at all clear that the plaintiffs even have the sort of interest in the zoning decisions being challenged here that would give rise to a procedural due process right, let alone the sort of right discussed in *Pearson* that would allow them to challenge Metro's decisions on substantive due process grounds.

Finally, the plaintiffs assert an equal protection claim against Metro on the grounds that their neighborhood has been treated differently from other similarly situated neighborhoods on the basis of the neighborhood's racial composition. The Sixth Circuit has held, however, that such a claim requires a showing that similarly situated persons were treated differently. *See Braun*, 519 F.3d at 574-75 (citing *Silver v. Franklin Twp., Bd. of Zoning Appeals*, 966 F.2d. 1031, 1036 (6th Cir. 1992)). As stated above, the plaintiffs have not alleged any such differential treatment of other similarly situated neighborhoods. As a result, the plaintiffs have not sufficiently pled an equal protection claim against Metro.

For these reasons, the plaintiffs' claims for violations of the 14th Amendment to the United States Constitution must be dismissed.

## IV. **State Law Claims**

Finally, the court finds that there are two grounds for dismissal of the remaining state law claims – for violation of the THRA and the due process and equal protection guarantees of the Tennessee Constitution. First, there is a strong presumption against the exercise, under 28 U.S.C. § 1367, of supplemental jurisdiction over remaining state law claims, once all federal claims have been dismissed, and residual supplemental jurisdiction should be exercised sparingly. *Packard v. Farmers Ins. Co. of Columbus Inc.*, 423 F. App'x 580, 584 (6th Cir.

17

2011); *see also Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 522 (6th Cir. 2007) ("[R]esidual supplemental jurisdiction [should] be exercised with hesitation, to avoid needless decisions of state law."); *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) ("[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims."). There is little reason, at this early stage of the litigation, for the court to retain supplemental jurisdiction over the state law claims. The parties have not yet engaged in discovery, set any trial or pretrial deadlines, and there is no indication that any statute of limitations concerns would be implicated, were this matter to be filed in state court. The court, therefore, declines to exercise supplemental jurisdiction over the plaintiff's remaining state law claims.

Second, even if the court were to exercise supplemental jurisdiction over the plaintiffs' state law claims, it is apparent that these claims could not survive the pleadings stage for the same reasons that the federal claims did not survive. Claims brought under the THRA are analyzed in the same way as are the corresponding federal law claims. *See Regnier v. Metro. Gov. of Nashville*, No. M2004-00351-COA-R3-CV, 2006 WL 1328937, * 7 (Tenn. Ct. App. May 11, 2006) ("It is clearly the law in Tennessee that federal case law on Title VII and related civil rights statutes may be used to interpret the THRA since the stated purpose and intent of the THRA is to execute the policies embodied within the federal anti-discrimination acts.") (citing TENN. CODE ANN. § 4-21-101)(a)(1)); *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 757-58 (6th Cir. 2012). Constitutional claims under the Tennessee Constitution are likewise analyzed in the same manner as the federal constitutional claims. *Riggs v. Burson*, 941 S.W. 2d 44, 52 (Tenn. 1997), *First Cmty. Bank, N.A. v. First Tennessee Bank, N.A.*, 489 S.W.3d 369, 383 (Tenn.

2015). Accordingly, the same grounds for dismissal apply with equal force to the plaintiffs' state law claims as to their federal claims.

For these reasons, the THRA and Tennessee Constitution claims will also be dismissed.

## **CONCLUSION**

For the foregoing reasons, the defendants' Motions to Dismiss will be granted, and this action will be dismissed in its entirety without prejudice.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge